UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ENGAI MAUL-BEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:13-cv-75-SEB-DKL |
| | ) | |
| JANE BRUBAKER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Entry Granting Motion for Summary Judgment**

Having considered the pleadings, the defendants' motion for summary judgment and the materials associated with such motion, the Court finds that the motion for summary judgment must be **granted.**

**I. Parties and Claim**

The plaintiff is Engai Maul-Bey, an Indiana prisoner. The defendants are Corizon Health Services, Barbara (mistakenly designated as "Jane") Brubaker, N.P., Dr. Ross, R. Moore, Vickie Poore, William Wolfe, M.D., Dr. Krembs, Dr. Dannewitz, Dr. Jones, Jane Elliott, and Dr. M. Person. Corizon Health Services contracts with the Indiana Department of Correction to provide medical services to Indiana inmates. The unopposed motion to dismiss defendant Rose Vaisvilas, who passed away while this action was pending, was granted.

This suit was removed to federal court from an Indiana state court. The operative pleading setting forth Maul-Bey's claim is the amended complaint filed on June 12, 2014. Maul-Bey alleges that over a period of years, and while he was incarcerated in various Indiana prisons, he was denied

constitutionally adequate medical care. The claim derived from these allegations is that he was subject to cruel and unusual punishment, in violation of the Eighth Amendment for which he originally sought both injunctive relief and damages. The claim for injunctive relief was dismissed as moot when Maul-Bey was no longer under the medical care or management of any of the defendants. This leaves for resolution Maul-Bey's claim for monetary damages, regarding which defendants seek summary judgment. Although defendants Dr. Dannewitz, Dr. Jones, Jane Elliott, and Dr. M. Person have not appeared in this action, each is identified as a medical provider who had contact with Maul-Bey during his incarceration. Maul-Bey has had ample opportunity to outline the medical care he received. The motion for summary judgment is therefore deemed to extend to these defendants as well. *See Malak v. Associated Physicians, Inc.,* 784 F.2d 277, 280 (7th Cir. 1986) ("Where one defendant files a motion for summary judgment which the court grants, the district court may *sua sponte* enter summary judgment in favor of additional non-moving defendants if the motion raised by the first defendant is equally effective in barring the claim against the other defendants and the plaintiff had an adequate opportunity to argue in opposition to the motion.").

## II. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The primary purpose of summary judgment is to isolate and dispose of factually unsupported claims." *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). "As stated by the Supreme Court,

2

summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1103 (7th Cir. 2008) (citations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323. A factual issue is material only if resolving it might change the outcome of the case under the governing law. *Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *Anderson,* 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D.Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of that party. *Anderson,* 477 U.S. at 255.

"A plaintiff may not defeat the defendant's properly supported motion for summary judgment without offering any significant probative evidence tending to support the complaint." *Tri-Gen Inc. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 433 F.3d 1024, 1038 (7th Cir. 2006). The key inquiry is whether admissible evidence exists to support a plaintiff's claims, not the weight or credibility of that evidence, both of which are assessments reserved to

the trier of fact. *See Schacht v. Wis. Dep't of Corrections,* 175 F.3d 497, 504 (7th Cir. 1999). "The nonmovant will successfully oppose summary judgment only when it presents definite, competent evidence to rebut the motion." *Vukadinovich v. Bd. of Sch. Trs.,* 278 F.3d 693, 699 (7th Cir. 2002) (internal quotation and citation omitted); *see Fed.R.Civ.P.* 56(c)(1)(A),(B) (both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."). In this case, Maul-Bey has opposed the motion for summary judgment, but has proffered no additional evidentiary materials. *See Alexander v. Caraustar Indus., Inc.*, 930 F. Supp. 2d 947, 957 (N.D.Ill. 2013) (stating that at summary judgment, "[f]ailure to respond to an opposing party's argument is not necessarily a waiver, but it is a risky tactic, and sometimes fatal").

"The applicable substantive law will dictate which facts are material." *National Soffit & Escutcheons, Inc., v. Superior Systems, Inc.,* 98 F.3d 262, 265 (7th Cir. 1996) (citing *Anderson,* 477 U.S. at 248). A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323.

### III. Undisputed Facts

The following facts are either undisputed or presented in the light most favorable to Maul-Bey as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

This saga dates back to March 8, 2009, when custodial staff persons at Wabash Valley reported to nursing staff persons that Maul-Bey had been observed placing a cell phone into his

rectum. However, nursing staff notes indicate that Maul-Bey's bowel sounds were normal, that Maul-Bey had no complaints of abdominal pain and had not incurred any rectal lacerations. A week later, Maul-Bey complained of anal itching. Nursing notes related to this follow-up examination reflect that there were no lesions, bleeding or skin tears to the area. Dr. Rogan examined Maul-Bey the next day and prescribed hydrocortisone ointment to treat the anal itching. Maul-Bey was monitored during this time because he was on a hunger strike. During the ensuing months, Maul-Bey was treated for a rash on his right foot, was evaluated for glasses, for shoulder pain and for an itchy anus. On July 14, 2009, Dr. Rogan again examined Maul-Bey, noting that he had an external nonthrombosed hemorrhoid. Anusol was prescribed to relieve the hemorrhoid. Dr. Rogan prescribed Anusol and other medications following an examination a month later, on August 18, 2009, and authorized a refill of these medications on September 1, 2009. In documents filed with the complaint, Maul-Bey attributes the cause of his rectal and other ailments as the March 2009 violent search of his rectum to locate the contraband as well as the splashing of toilet water into his rectum. The persons performing that search have not been named as defendants in this case.

Maul-Bey was transferred to the Westville Correctional Facility on September 17, 2009, where he was placed in the prison's Chronic Care Clinic due to a major depressive disorder and chronic joint pain at multiple sites on his body.  Upon his arrival at Westville, he promptly submitted a request for healthcare. On September 23, 2009, nursing staff examined him and recommended that he take stool softeners and increase fluid intake to treat his hemorrhoids and take Ibuprofen as directed to reduce his shoulder and knee pain. He was examined by Dr. Ross on September 30, 2009, and by nursing staff relative to other ailments on October 25, 2009.

Maul-Bey submitted another request for healthcare on November 3, 2009. On November 18, 2009, Dr. Ross examined him for complaints of urinary hesitancy. His vital signs were determined to be normal and his prostate, though not tender, was enlarged and boggy, but without any masses. Dr. Ross diagnosed Maul-Bey with Benign Localized Hyperplasia of the Prostate and prescribed Cardura to assist him in urinating. She also ordered a comprehensive metabolic panel.

Medical staff examined Maul-Bey again on November 25, 2009, and determined that his vital signs were stable. Further healthcare was provided frequently during the ensuing months. The Cardura prescription was replaced with Hytrin. Dr. Ross examined Maul-Bey on April 26, 2010, found his vital signs again to be normal, continued the current prescription for Ibuprofin and prescribed Triamcinolone and an antifungal ointment. Testing of a urine sample revealed trace amounts of blood, protein, nitrates, and white blood cells. Dr. Ross prescribed Bactrim DS, a broad spectrum antibiotic, on August 11, 2010. Also in August 2010, and again the following month, Maul-Bey was seen for lower back pain. X-rays of his spine were taken and found to be normal.

On November 29, 2010, nursing staff evaluated Maul-Bey for complaints of rectal bleeding, pain, and discomfort. The nurse noted small open areas from his rectum to scrotum, cleaned the area and applied ointment, and obtained an order from Barbara Brubaker, N.P. for Septra D, an antibiotic.

Dr. Krembs submitted the proper paperwork to obtain the non-formulary Triamcinolone cream. N.P. Brubaker prescribed the Triamcinolone Acetonide cream on December 28, 2010.

Dr. Ross examined Maul-Bey in the Chronic Care Clinic on January 21, 2011 and again on February 11, 2011. On March 13, 2011, Dr. Ross examined Maul-Bey for complaints of shortness of breath, cough, and an upset stomach. Antibiotics were prescribed.

On April 26, 2011, N.P. Brubaker examined Maul-Bey in the Chronic Care Clinic. He informed her that he believed he had prostatitis and reported spasms in his penis, low back pain, and dysuria, or painful urination. He requested a biopsy of the head of his penis. His vital signs were normal. N.P. Brubaker prescribed Cipro, an antibiotic, for possible prostatitis and ordered (i) a prostate-specific antigen (PSA) test, (ii) stool occult blood to check for hidden blood in his stool, (iii) a thyroid panel, and (iv) a urinalysis. Prostatitis is a swelling and inflammation of the prostate gland and can result from a variety of causes. It is not harmful in and of itself but can cause other difficulties like impeded or painful urination. Based on the recommendation of the Regional Medical Director, the PSA test was delayed until the prostatitis resolved, to avoid a  skewing of the PSA results.

Dr. Ross left his medical post at Westville in mid-year 2011 and had no further involvement with Maul-Bey's medical care. Dr. Dannewitz and Nurse Elliott had also provided medical care to Maul-Bey at Westville. In May 2011, Maul-Bey submitted healthcare requests relating to his medications. On June 1, 2011, Dr. Krembs examined Maul-Bey in the Chronic Care Clinic, noting that his prostate was enlarged and tender. Dr. Krembs suspected chronic prostatitis based on Maul-Bey's medical history and prescribed a 12-week course of Amoxil, an antibiotic. Two weeks, thereafter, on June 16, 2011, Nurse Moore examined Maul-Bey for abdominal pain and a burning sensation during urination. Maul-Bey reported no relief from the antibiotics he had been given and concluded that he had likely acquired a fungal infection

resulting from a hunger strike he engaged in in 2009. The exam revealed that his abdomen was tender and there were active bowel sounds.

On June 29, 2011, Dr. Krembs examined Maul-Bey for chronic prostatitis. Maul-Bey reported only minimal improvement in his symptoms with Amoxicillin. Dr. Krembs' physical exam included ordering x-rays of Maul-Bey's chest and abdomen, and directions for him to complete his 12-week course of Amoxicillin, since he had experienced some improvement after 4 weeks. The treatment would not be effective without completing the entire course. The chest x-ray was normal. The abdominal x-ray showed only a moderate amount of fecal material in the colon and was otherwise normal.

Maul-Bey continued to alert medical staff at Westville regarding his symptoms. Tests were performed, always with negative results. He relayed his concerns of specific conditions and requested myriad kinds of testing for these conditions. Based on a session he had with N.P. Brubaker on August 10, 2011, Maul-Bey was referred to Behavioral Health, which determined that he exhibited compulsive behavior, his speech was pressured, and he had poor attention span and concentration. On August 31, 2011, Dr. Krembs evaluated Maul-Bey's numerous vague complaints relating to multiple organ systems, including chronic pelvic pain, for which, despite having received multiple rounds of antibiotics, still persisted. When Dr. Krembs performed a digital rectal exam, he found the prostate to be tender, for which he prescribed Augmentin, an antibiotic, and Vibra-tabs (Doxycycline), another antibiotic. Dr. Krebs also ordered a chest x-ray.

Maul-Bey's persistent complaints to the medical staff continued without let up, referencing  wide variety of maladies.

On December 20, 2011, Nurse Moore examined Maul-Bey during sick call relative to complaints of a rectal infection and a lesion to the rectum. Nurse Moore observed an open area to the buttocks, just below the scrotum, in the shape of a straight line, but there was no redness or tenderness to palpation. Nurse Moore applied Neosporin and referred him to a physician. On January 6, 2012, Dr. Krembs examined Maul-Bey in the Chronic Care Clinic. Maul-Bey insisted that Dr. Krembs prescribe Vancomycin and Levaquin for his "infections," but his request was refused because he was not suffering from any infections warranting those particular medications.

On February 22, 2012, Maul-Bey was transferred from Westville to the Pendleton Correctional Facility. At Pendleton, Dr. Wolfe served as the primary care physician and Vickie Poore as the Health Services Administrator.  Two other physicians, Dr. Jones and Dr. Person, also provided medical care to Maul-Bey at Pendleton.

On February 23, 2012, Dr. Wolfe continued Maul-Bey's medications, including Hytrin, Fluoxetine (Prozac) and Vibra-Tabs. Maul-Bey was enrolled in the Chronic Care Clinic program at Pendleton for hypertension, prostate issues, hypochondriasis, and joint pain. He was seen every 90 days by a provider for those conditions as an enrollee in the Clinic. On February 25, 2012, Maul-Bey submitted a Request for Healthcare seeking his doxycycline for infection. Medical staff responded two days later that the medication had been ordered and received on February 27, 2012. The next day, February 28, 2012, Maul-Bey submitted another request for healthcare asking to see the doctor because the doxycycline seemed to be helping his chest a little bit, but not the other ailments.

On March 19, 2012, Dr. Wolfe sent a letter of noncompliance to Maul-Bey because he had refused to take his Hytrin. In that letter, Dr. Wolfe explained that if Maul-Bey continued to

refuse his medication, he would cancel the Hytrin order. He also warned him of the risk of not taking his medication. On March 20, 2012, Dr. Wolfe examined Maul-Bey for multiple somatic complaints, including a three-year history of perirectal infection; prostate infection; tinnitus; salivary gland infections; pale skin on his nose and face; neck node enlargements; eye pain; and mucoid stools. Maul-Bey requested a prescription for Vancomycin, but since he did not have an infection, that drug was not warranted. Dr. Wolfe specifically noted that Maul-Bey suffered from hypochondriasis, adding this to Maul-Bey's list of chronic issues, based on his review of Maul-Bey's records from Westville and his own interactions with Maul-Bey. Hypochondriasis is defined as an excessive fear or anxiety of serious illness, which manifests in thoughts by the patient that he has illnesses that he does not actually have.

On March 22, 2012, Maul-Bey submitted a Request for Healthcare stating that he was refusing to take his Hytrin. In response, Dr. Wolfe discontinued Hytrin on March 23, 2012, due to noncompliance. Hytrin is a drug used to treat symptoms associated with prostatitis or benign prostatic hyperplasia. In April, May and June 2012, Maul-Bey submitted multiple healthcare requests, each of which was noted and responded to with orders or re-orders of diagnostic tests, changes in his medication as warranted, and cortisone cream for Maul-Bey's complaints of rectal irritation. This process continued over the next eighteen months.

- On July 8, 2012, Maul-Bey submitted two requests for healthcare complaining of infection, painful rectum, skin color changes, foot rash, and swollen groin. Dr. Wolfe responded the next day that his tests showed he did not have a C. Diff infection, no eggs or parasites in his stool, no bacterial infection and that skin color changes did not indicate a medical problem and that he would be scheduled in the clinic.

- On July 11, 2012, Maul-Bey submitted another request for healthcare complaining of infection from toilet water splashing on him. Dr. Wolfe replied the next day, informing him that he did not have an infection, did not need antibiotics, did not have C Difficile, and that he would not have been infected based on toilet water having been splashed on him.

- On July 17, 2012, Dr. Wolfe examined Maul-Bey for various chronic complaints, including rectal infection from toilet water; sore throat; migraine headaches; rash on his feet; general body infection; and nocturia. Dr. Wolfe advised him that he did not have any systemic infection based on the multiple lab studies that had been obtained. Dr. Wolfe believed that some of his symptoms were due to prostatitis, which is swelling or inflammation of the prostate gland, for which hemorrhoid suppositories and hydrocortisone cream were again provided. He also received ordered Propranolol for migraine headaches.

- On July 27, 2012, Dr. Wolfe ordered Macrodantin for Maul-Bey's prostatitis.

- Maul-Bey was examined by Dr. Wolfe in the Chronic Care Clinic on August 14, 2012, Dr. Wolfe examined Maul-Bey in the Chronic Care Clinic based on complaints of an infection in his rectum and brain, and vision problems. He stated that he could "feel his brain pushing against his skull." He requested IV antibiotics and demanded a 90-day supply of Flagyl. There was no indication of an infection based on extensive lab work. When Dr. Wolfe told Maul-Bey that he would not order medications that were not indicated, Maul-Bey began cussing at Dr. Wolfe and physically threatened him.

- On August 26, 2012, nursing staff evaluated Maul-Bey for swelling to his left hand as well as rectal pain. The nurse's exam revealed a normal hand and fingers with no obvious swelling and normal range of motion. Maul-Bey complained of "extreme rectal pain" and insisted that he needed antibiotics for a rectal infection. The nurse noted that his records showed that he had received numerous tests and medications for rectal pain and irritation. On August 28, 2012, Dr. Wolfe examined Maul-Bey for chronic rectal discomfort, hemorrhoids and a swollen left land. His lab results continued to show no evidence of an infection and a physical exam showed no significant external hemorrhoids. Dr. Wolfe ordered an x-ray of Maul-Bey's hand and the results of the x-ray were normal.

On September 2, 2012, Maul-Bey submitted yet another request for healthcare complaining that his lymph nodes were swollen due to a rectal infection. Dr. Wolfe determined that Maul-Bey did not have an infection. On September 5, 2012, Maul-Bey submitted three additional requests for healthcare, complaining that he had been denied proper medical treatment because Dr. Wolfe's "colleagues at Wabash Valley perpetuated lies about him and his medical condition in an attempt to cover up an illegal digital rectal examination." He claimed that the rectal exam performed at Wabash Valley on March 8, 2009, caused a rectal infection. He believed that the exam caused a lesion that got infected from toilet water. Dr.

Wolfe replied that Maul-Bey did not have a rectal infection and that he had not received any "lies" from Wabash Valley. Maul-Bey also requested a CT scan or colonoscopy. Dr. Wolfe replied that there was no need for these tests because they were not medically indicated. Maul-Bey complained that the medication he was on was causing further problems. Dr. Wolfe therefore cancelled his Macrodantin prescription per Maul-Bey's request on September 7, 2012.

Maul-Bey submitted three more requests for healthcare on September 9, 2012, asserting that that Dr. Wolfe had underestimated the extent of his infection, including a brain infection and a rectal infection, that his hemorrhoids needed to be removed, and that his eyes were red and blurry. Dr. Wolfe responded to each request, informing him that each of these issues had already been addressed, that he did not have an infection, including a brain infection, and that his hemorrhoids were not bad enough to warrant an invasive procedure.

Maul-Bey submitted three additional requests for healthcare on September 11, 2012, based on his perceived rectal infection and brain infection. Dr. Wolfe responded to each request and informed him that he did not have a brain infection, that all of his stool tests had been negative, and that he did not need a spinal tap as he had requested. Maul-Bey submitted two more requests for healthcare on September 13, 2012, again complaining that his rectum was painful and that he needed more antibiotics for an infection. Dr. Wolfe responded to each request, informing him that he would perform a digital rectal exam on Maul-Bey at his next visit and that Maul-Bey did not need more antibiotics. Maul-Bey submitted another request for healthcare on September 16, 2012, announcing that he had stopped taking his Propranolol because it gave him heart palpitations and requesting the antibiotic Flagyl. Dr. Wolfe told Maul-Bey that Flagyl was not warranted. On September 17, 2012, Dr. Wolfe cancelled Maul-Bey's Propranolol. Maul-Bey submitted two requests for healthcare on September 18, 2012, again

regarding rectal pain and bacteria resistance. Dr. Wolfe again responded to each request reminding Maul-Bey that these issues had previously been addressed. When Maul-Bey submitted yet another a request for healthcare on September 30, 2012, regarding rectal pain, he was scheduled to see the doctor.

On October 2, 2012, Dr. Wolfe examined Maul-Bey and performed a rectal and testicular exam, which revealed a mildly enlarged prostate that was smooth and without masses or nodularity. The exam results were essentially normal. Maul-Bey was unwilling to accept the report that diagnostic labs and exams had identified no infection. Dr. Wolfe therefore ordered a PSA test. On October 5, 2012, Maul-Bey submitted a request for healthcare requesting Dr. Wolfe to explain the details of his hemorrhoids. Dr. Wolfe replied that his hemorrhoids were internal, located just inside his rectum, and that they were not actively bleeding.

Maul-Bey submitted three more requests for healthcare on October 9, 2012, regarding the shape and contour of his feces, arguing about what kind of hemorrhoids he had, and other physical ailments ranging from his eyes to his toes. Dr. Wolfe responded to two of these requests by educating Maul-Bey on his condition. Medical staff responded to the third request by declining any invasive medical testing as unnecessary. On October 11, 2012, Maul-Bey submitted three requests for healthcare, insisting he had an infection in his rectum and prostate. He also complained of constipation. Dr. Wolfe replied that Maul-Bey showed no signs of an infection and that these issues had been addressed multiple times. On October 12, 2012, Dr. Wolfe ordered Dulcolax to treat Maul-Bey's complaint of constipation. Maul-Bey submitted two requests for healthcare on October 13, 2012, regarding the rectal infection he claimed to have had since 2009, with requests as to proper treatment given that his semen was turning

yellow. Dr. Wolfe responded to both requests, informing him that these issues had already been addressed and that additional antibiotics were unnecessary.

Maul-Bey submitted three requests for healthcare on October 16, 2012, reporting that he had what looked like electricity in his vision, that he had night sweats, that his fingernails had not grown, and that he had swollen lymph nodes. Dr. Wolfe responded to these requests and reports, informing Maul-Bey that he was scheduled to be seen. Maul-Bey submitted a request for healthcare on October 19, 2012, complaining of a sore throat and of a hole that had been eaten in his chest. Medical staff responded that he was scheduled to be seen in clinic and on October 23, 2012, Michelle Myers, N.P. examined Maul-Bey for an upper respiratory infection. Maul-Bey said he had an infection since 2009 that had spread to all areas of his body. NP Myers offered Maul-Bey Claritin, but he declined. He also complained of anal pain, saying that his "ass hurt." NP Myers reviewed his chart and saw that Dr. Wolfe had already addressed his complaints of rectal pain. NP Myers' physical exam was normal except for his sore throat. Maul-Bey responded by yelling and screaming that he was not being treated appropriately.

On November 27, 2012, Dr. Wolfe again examined Maul-Bey in the Chronic Care Clinic. Maul-Bey continued to complain of chronic infection from water splashing onto his rectum in 2009. Dr. Wolfe ordered more lab work, including a CMP, CBC, and Sed rate, but was unable to perform a physical exam because Maul-Bey became upset and stormed out of the exam room.

On December 19, 2012, Maul-Bey submitted a request for healthcare seeking treatment for an open lesion which he said was located between his anus and his testicles. On December 28, 2012, Dr. Wolfe examined Maul-Bey for perianal swelling and additional complaints of a "messed up throat." Maul-Bey reported a small mass on his perineum between his anus and

scrotum. He stated that the area was tender but the pain had resolved after five days. A physical exam revealed no abnormality of the anus or perineum. Additionally, his neck and pharynx were normal. Dr. Wolfe ordered Triamcinolone cream for his perineum.

This pattern of continued requests for medical attention persisted. On February 19, 2013, Dr. Wolfe examined Maul-Bey in the Chronic Care Clinic. His blood pressure was under good control. Maul-Bey complained of a sore throat, rectal pain, eye pain, and color vision derangement. Dr. Wolfe's exam showed that his throat, neck and eyes were unremarkable. Dr. Wolfe referred Maul-Bey to optometry for his eye pain and vision complaints. Dr. Wolfe examined Maul-Bey's rectum, which appeared normal, with no lesions, infections, or masses. When Dr. Wolfe advised him that his rectal exam was normal, Maul-Bey again got upset and left the exam room.

On April 2, 2013, Dr. Wolfe ordered repeat labs—lipids and sed rate. On April 5, 2013, nursing staff performed an EKG on Maul-Bey due to chest pain. His vital signs were normal and he denied current chest pain. Dr. Wolfe reviewed the EKG and discussed it with Maul-Bey. Maul-Bey again became upset and started saying "shut up!" and using curse words, so Dr. Wolfe asked him to leave. On April 19, 2013, Maul-Bey refused his blood draw.

On May 1, 2013, nursing staff was scheduled to do a blood draw on Maul-Bey, but ended up having to evaluate him for complaints of chest pain. The nurse conducted a thorough assessment, took Maul-Bey's vital signs, drew blood, and advised him that there was no indication of necessity for an EKG. Maul-Bey became irate, started yelling obscenities, and called the medical staff derogatory names. After he became physically threatening, he was removed from the area. On May 7, 2013, Maul-Bey submitted two requests for healthcare complaining of joint pain, chest pain, eye pain, rectal pain, constipation, and rash on his feet.

Dr. Wolfe responded that these issues had previously been addressed at prior clinic visits and that they could discuss his complaints further at his next clinic visit.

On May 12, 2013, Maul-Bey submitted a request for healthcare to Vickie Poore requesting information about the process for his family to pay for an "outside" doctor to examine him. He informed her that he did not want to see Dr. Wolfe again. Poore explained that he would not be able to have his family arrange for an appointment with a doctor outside of the facility, due to the security rules of the prison.  On May 16, 2013, Maul-Bey submitted another request for healthcare to Poore requesting to see a doctor other than Dr. Wolfe. Poore responded that he was not authorized to choose specific care providers. On May 31, 2013, Maul-Bey sent two requests for healthcare to Poore asking her to explain the results of his lab tests. Poore responded, telling Maul-Bey that she had forwarded his requests to Dr. Wolfe so he could address these issues. Dr. Wolfe answered Maul-Bey's questions, promising further discussion at the next clinic visit. Maul-Bey submitted a third request for healthcare on May 31, 2013, complaining of anus/prostate pain; skin complexion; heart palpitations; shortness of breath; dizziness; rash on feet; white spot on thumb; and tingling and itching in his hands, arms, and lower legs. Dr. Wolfe responded saying he would address the issues at the next clinic visit. Maul-Bey submitted a request for healthcare on June 5, 2013, asking for the results of his blood test and reporting that his anus was painful. Dr. Wolfe responded that they would discuss these issues at the next clinic.

On June 20, 2013, Dr. Wolfe examined Maul-Bey in Chronic Care Clinic. Maul-Bey again was argumentative, agreeing to discuss only his rectal issues. He said he had performed his own rectal exam and his rectum was tight around his finger, which he thought was abnormal. He reported rectal problems, throat discomfort, voice box changes, groin pain, throat pain,

pelvic pain, back pain and constipation. He was angry about his most recent lab results, which were normal. He seemed fixated on a slightly elevated Sedimentation Rate of 26, which was shown to be minimally elevated based on a very nonspecific test. When Dr. Wolfe advised him of this outcome, Maul-Bey became angry. Dr. Wolfe offered to perform a rectal exam and repeat his blood work, but Maul-Bey did not respond, instead becoming verbally abusive and profane. When Dr. Wolfe requested that officers remove him, he stood up and kicked Dr. Wolfe twice, striking his hand. Maul-Bey thereafter submitted four more requests for healthcare on June 23, 2013, complaining that Dr. Wolfe was not trying to figure out why he was bleeding from his anus; asking about the results of his blood test; complaining of yellow mucous coming from his anus; pain in his rectum, hips, groin, and back; tingling in his feet; and frequent urination. Poore forwarded these requests to the doctor to handle, informing Maul-Bey that each request would be addressed by the doctor.

On July 1, 2013, Maul-Bey submitted a request for healthcare reporting that he believed his constipation was due to his prostate infection that was ultimately caused by his rectal infection, and that his arms and legs were changing colors. Dr. Wolfe responded by reviewing Maul-Bey's history of symptoms, test results and treatments; he also ordered Colace and Dulcolax for constipation, but did not order antibiotics because they were not warranted.

Dr. Wolfe departed from his employment at the prison on September 13, 2013, after which he had no further involvement with Maul-Bey's medical care.

On September 25, 2013, Dr. Clarkson examined Maul-Bey for recurrent rectal pain and noted his long history of perceived anal infection. He ordered a colonoscopy. On September 29, 2013, Maul-Bey was found unresponsive in his cell and, when medical arrived, he was guarding his abdomen. He was sent to the hospital emergency room via ambulance, where he

was diagnosed with acute gastroenteritis, or inflammation of the stomach lining. He was returned to the prison the same day with recommendations for Loperamide and Phenergan.

On November 18, 2013, Maul-Bey had a colonoscopy, which showed a small hemorrhoid and no polyps, and no recommendation for a biopsy. Dr. Person discussed his results with him and scheduled him for a prostate exam. On November 25, 2013, Dr. Person performed a prostate exam, which was normal, but tender. Dr. Person diagnosed Maul-Bey with an ulcer of the rectum with erythema.

Throughout Maul-Bey's medical care as detailed above, the medical providers took his complaints seriously, responded promptly, and made reasoned medical decisions based on their evaluations of him and his medical history. The care Maul-Bey received for his various ailments was well within the community standard of care. There was no corporate practice, procedure, or policy of Corizon to deny patients healthcare due to cost concerns. Indeed, Maul-Bey's medical care was not affected in any negative way by any corporate policy, practice, or procedure of Corizon.

## IV. Discussion

Maul-Bey's claim is that throughout his confinement in various Indiana prisons his medical providers have suppressed his true condition and failed to adequately treat it. He has brought this action pursuant to 42 U.S.C. § 1983, "the ubiquitous tort remedy for deprivations of rights secured by federal law (primarily the Fourteenth Amendment) by persons acting under color of state law." *Jackson v. City of Joliet,* 715 F.2d 1200, 1201 (7th Cir. 1983), *cert. denied,* 465 U.S. 1049 (1984). To state a claim under 42 U.S.C. Section 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law. *West v.*

*Atkins,* 487 U.S. 42, 48 (1988). "Section 1983 is not itself a source of substantive rights; instead it is a means for vindicating federal rights elsewhere conferred." *Ledford v. Sullivan,* 105 F.3d 354, 356 (7th Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Accordingly, "the first step in any [§ 1983] claim is to identify the specific constitutional right infringed." *Albright v. Oliver,* 510 U.S. 266, 271 (1994).

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis,* 118 S. Ct. 1708, 1719 (1998) (citation omitted). The specific constitutional provision underlying Maul-Bey's claims is the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *Helling v. McKinney,* 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Under the Eighth Amendment, inmates are entitled to receive adequate medical care in light of their particular maladies. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To determine if the Eighth Amendment has been violated in the prison medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (en banc) (citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)). A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). On the subjective prong, the

plaintiff must establish that the defendant "acted in an intentional or criminally reckless manner, *i.e.,* the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005).

For Eighth Amendment purposes in this case, there are three categories of defendants. The first group consists of the medical providers, that is, the several medical doctor defendants as well as the two nurse practitioner defendants. The second group is comprised of the defendant individuals who were not medical providers, those being LPN Ryann Moore and Administrator Vickie Moore. The third defendant is Corizon, the corporate employer of the defendant individuals. LPN Moore is not included in the first group because she did not play any role in deciding on an appropriate treatment for Maul-Bey and made no diagnostic judgments; her role was limited to assessing Maul-Bey's condition from time to time and passing that information, together with his symptoms, on to medical providers, who did perform diagnostic and treatment steps for Maul-Bey.

A different legal standard is applicable to each category of defendant.

- "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (internal quotation marks omitted). However, "if the defendant's chosen 'course of treatment' departs radically from 'accepted professional practice,' a jury may infer from the treatment decision itself that no exercise of professional judgment actually occurred." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016).

- Non-medical professional defendants are entitled to rely on whatever determination was made by medical professionals. *See Arnett v. Webster,* 658 F.3d 742, 755 (7th Cir. 2011) ("Non-medical defendants . . . can rely on the expertise of medical personnel."); *Knight v. Wiseman,* 590 F.3d 458, 465 (7th Cir. 2009) (officers were entitled to rely on fact that prisoner had no medical work restrictions on his record to conclude that he could work without injury).

- To establish liability against a corporate entity such as Corizon, a plaintiff must introduce evidence that establishes a plausible inference that Corizon "maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Woodward v. Correctional Medical Services*, 368 F.3d 917, 927 (7th Cir. 2004). To prove that a Corizon policy rather than the acts of its employees caused the harm, "[e]ither the content of an official policy, a decision by a final decisionmaker, or evidence of custom will suffice." *Glisson v. Indiana Department of Correction,* No. 15-1419, 2017 WL 680350, *5 (7th Cir. Feb. 21, 2017). The plaintiff must "show that a [Corizon] policy was the 'direct cause' of or 'moving force' behind his constitutional injury." *Pyles,* 771 F.3d at 409-410; *Glisson,* 2017 WL 680350 at *5 ("The central question is always whether an official policy, however expressed (and we have no reason to think that the list in *Monell [v. New York City Dept. of Soc. Serv.* 436 U.S. 658 (1978)], is exclusive), caused the constitutional deprivation.").

A court examines the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to his serious medical needs. *Reed v. McBride,* 178 F.3d 849, 855 (7th Cir. 1999). Although the Eighth Amendment does not entitle an inmate to specific forms of treatment, prison medical staff cannot simply continue with a course of treatment that is known to be ineffective. *See Greeno v. Daley,* 414 F.3d 645, 654-55 (7th Cir. 2005). Furthermore, delay in providing treatment can constitute deliberate indifference when it causes unnecessary pain. *Arnett v. Webster*, 658 F.3d 742, 752-53 (7th Cir. 2011); *Grieveson v. Anderson,* 538 F.3d 763, 779 (7th Cir. 2008). But a plaintiff must do more than show that he was not given the very best of treatment; he must show that the medical providers' course of treatment was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Petties,* 836 F.3d at 729 (quoting *Cole v. Fromm,* 94 F.3d 254, 261–62 (7th Cir. 1996)).

The defendants do not dispute in the context of this motion that Maul-Bey may have suffered from a serious medical condition at various times during his course of treatment.

Regarding the second element of his claim, however, the record before us in this case reveals that Maul-Bey's complaints were in every instance appropriately responded to and treated by the medical providers. The evidence establishes that Maul-Bey received consistent attention in response to many ongoing medical complaints and conditions. The fact that on occasion he did not receive the treatment he preferred (or the diagnoses he evidently believed were warranted) does not create a genuine issue of material fact to support his deliberate indifference claim. *See Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006) ("dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient" to sustain a claim of deliberate indifference). To the contrary, the evidentiary record reveals no indication of the kind of subjective knowledge required to establish deliberate indifference, *i.e.,* that the defendants were "subjectively aware of [Maul-Bey's] serious medical needs and disregarded an excessive risk that a lack of treatment posed to his health or safety." *Wynn v. Southward,* 251 F.3d 588, 593 (7th Cir. 2001). The most favorable inference flowing from the evidence that supports of Maul-Bey's allegations is that the care providers disagreed with his opinions as to the proper course of treatment. However, a mere disagreement with a provider's medical judgment is not enough to establish deliberate indifference. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). Even "evidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim." *Id.*; *Holloway v. Del. Cnty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012). The medical defendants are therefore entitled to the entry of summary judgment on Maul-Bey's claims against them.

LPN Moore and Administrator Poore merely deferred to the judgments of the medical providers. As such, they were not under a duty to act independently of those judgments. *See Diggs v. Dr. Parthasarathi Ghosh, et al.,* No. 16-1175, 2017 WL 957201, at *5 (7th Cir. Mar.

13, 2017) ("As a layperson, the warden could rely on the medical staff's expertise as long as he did not ignore Diggs or his mistreatment.")(citing cases); *Rice ex rel. Rice v. Corr. Med. Servs.,* 675 F.3d 650, 676 (7th Cir. 2012). These defendants are therefore also entitled to the entry of summary judgment on Maul-Bey's claims against them.

As for the remaining claim against Corizon, Maul-Bey has failed to show a basis for liability against Corizon. Specifically, there was no evidence of a violation of the Eighth Amendment by Corizon's employees. Neither was there any competent evidence from which a reasonable jury could conclude that a Corizon policy was the "direct cause" of or "moving force" behind his constitutional injury. Corizon is therefore entitled to summary judgment on Maul-Bey's claim against it.

## V. Conclusion

"After one party has filed a motion for summary judgment, 'the burden shifts to the non-moving party to show through specific evidence that a triable issue of fact remains on issues [on] which the non-movant bears the burden of proof at trial.'" *Pharma Bio, Inc. v. TNT Holland Motor Express, Inc.,* 102 F.3d 914, 916 (7th Cir. 1996) (quoting *Walker v. Shansky,* 28 F.3d 666, 670-71 (7th Cir. 1994)).

As has been explained, "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford-El v. Britton,* 118 S. Ct. 1584, 1598 (1998). This is a vital part of the management of court dockets, of the delivery of justice to individual litigants, and in meeting society's expectations that a system of justice operate effectively. Indeed, "it is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir.

1983).

"Federal courts must take cognizance of the valid constitutional claims of prison inmates." *Babcock v. White,* 102 F.3d 267, 275 (7th Cir. 1996) (quoting *Turner v. Safley,* 482 U.S. 78, 84 (1987)). However, Maul-Bey has identified no genuine issues of material fact relative to his claims against any of the defendants or any legal entitlement to recover against them. The defendants' motion for summary judgment [dkt 98] is therefore **granted**.

Final judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: ___3/21/2017_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email generated by the court's ECF system.

ENGAI  MAUL-BEY
902647
INDIANA STATE PRISON
Inmate Mail/Parcels
One Park Row
MICHIGAN CITY, IN 46360